UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **VICTOR SIMS, II,** | ) |
| **Plaintiff,** | ) |
| | ) Civil Action Number |
| v. | ) **2:22-cv-00178-AKK** |
| | ) |
| **CITY OF HOMEWOOD, ALABAMA,** | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Victor Sims II, a police officer with the Homewood Police Department, brings this suit against the City of Homewood for alleged racial discrimination. *See* doc. 1. Specifically, Sims alleges that Homewood subjected him to race-based disparate treatment, retaliated against him for engaging in protected acts, and failed to train its officers regarding Title VII and its import in the workplace. *Id*. Homewood moves to dismiss each of Sims's claims. *See* docs. 5, 6. For the reasons that follow, Homewood's motion, doc. 5, is due to be denied as to Sims's retaliation claims under Title VII and 42 U.S.C. § 1983, but is due to be granted in all other respects.

**I.**

Sims joined HPD in 2008, and by 2021 had risen to the rank of detective in the Special Investigations Unit. Doc. 1 at 3-4.   In August 2021, Lieutenant Greg

Brundage told Sims that HPD planned to reassign Sims to a school resource officer or a patrol officer role – "in either case a demotion." *Id*. at 4. Brundage attributed the decision to HPD's "five-year rule," which requires the reassignment of officers who have served for five years on a special assignment. *Id*. Sims, however, alleges that HPD regularly "waives, ignores or otherwise does not enforce" the five-year rule for white officers. *Id*. at 4, 11.

Shortly after his conversation with Brundage, Sims emailed Brundage, "Sergeant Marquard," and Chief Tim Ross asserting that racial animus factored into the reassignment. *Id*. at 4-5. In his email, Sims described several instances of alleged racial discrimination within the department, including: (1) Brundage telling Sims that a white officer's position was permanent, despite the position being "typically a maximum of 3 years" according to HPD policy; and (2) a white HPD sergeant "venting" to Brundage about how he "couldn't work for a black man," and subsequently being "shifted, not fired or otherwise severely disciplined." *Id*. at 5-7. Sims also claimed in his email that the white officer being "groomed" to take Sims's position as a detective was not qualified for the Special Investigations Unit, and he noted that although several Black officers discussed racism within HPD with Chief Ross several years earlier, HPD made no significant changes. *Id*. Sims did not receive a substantive response to his email. *Id*. at 7.

Sims then filed a complaint with the Equal Employment Opportunity Commission alleging race-based discrimination, and he attached his email as an exhibit. *Id*. at 7-8. Sims filed an amended EEOC charge several weeks later, claiming that HPD's silence in response to his initial email evinced a culture of retaliation against complainants. *Id*. at 8-10. In particular, Sims alleged that: (1) "HPD won't interview Black officers or HPD employees regarding racism;" (2) a white sergeant began referring to Sims as "the enemy" after he filed his initial EEOC charge; and (3) a white corporal told colleagues that if Sims's EEOC complaint negatively impacted the corporal's position within HPD, the corporal would "wind up getting [himself] fired" because he would "whip [Sims's] ass." *Id*. HPD responded to both charges, but Sims alleges that the responses "primarily vilified and demonized" Sims and demonstrated "no neutral or good faith attempt to address the substance" of his complaints. *Id*. at 8, 10-11.

In response to Sims's complaints, "HPD abandoned [its] scheme" to explicitly demote Sims and instead decided to eliminate the Special Investigations Unit altogether, "effectively demot[ing] [Sims] down to patrol officer" and thereby lowering his salary. *Id*. at 11-12. Two white detectives in the SIU were able to retain their title and pay due to additional assignments within HPD, but one white officer lost her SIU job as part of the "collateral damage" caused by HPD's "retaliation against [] Sims" for filing his complaints. *Id*.

Sims had several conversations with fellow officers about HPD's decision to eliminate the SIU, in which they "expressed their frustration, exasperation and contempt for what has been commonly seen as retaliation against [Sims] for complaining about racism within HPD." *Id*. at 14-17. For example, one officer described the decision as "punishment" for Sims raising his complaints, and several officers told Sims that "everybody knows" that Sims's complaints motivated the elimination of the SIU. *Id*. Homewood's chief magistrate shared this same sentiment with Sims. *Id*.

Beyond these SIU-related allegations of disparate treatment and retaliation, Sims also claims that Homewood has long had notice of racial discrimination within HPD and has acted with deliberate indifference in failing to address it. *Id*. at 17-20. For example, Sims filed an EEOC race discrimination claim in 2015 regarding "the then-Chief *ordering* Black officers [to] work a Black Lives Matter vigil[] because it would look better for the media," and he noted the filing of three other EEOC race-discrimination claims against Homewood and HPD since 2019. *Id*. (emphasis in original). Also, in 2016, Chief Ross "met with several [B]lack HPD officers who were concerned about racial tension in the HPD" and promised a "diversity initiative," but he allegedly never followed through. *Id*. During this conversation, the officers told Ross about a particular officer's "troubling racist track record," including his use of a racial slur in referring to a Black colleague, but the officer later

received "the prestigious Chief's Award." *Id*. Additionally, in 2020, an HPD officer posted "a racist, violent, 'meme' on Facebook," but faced "no substantive disciplinary action." *Id*. And later that year, an officer posted "racist, violent 'rap' videos" to social media that he recorded while in uniform in an HPD patrol car. *Id*. HPD demoted this officer but only issued him a three-day suspension. *Id*. Despite these incidents, Sims alleges, "Homewood provides only infrequent training courses, seminars and the like to the HPD regarding workplace racism and race discrimination." *Id*. at 20. Thus, Sims claims, "[w]ith actual knowledge of the HPD's and Chief Ross's abysmal track record regarding workplace racism and, over the years, Chief Ross consistently ignoring or coddling [] racists within the HPD, [] Homewood continues to simply bury its head in the sand regarding training and supervising both Chief Ross, the HPD Command Staff and all of its officers and employees regarding workplace race discrimination." *Id*.

Based on these allegations, Sims pleads claims for: disparate treatment (Count 1) and retaliation (Count 2) under Title VII, and "race-based employment discrimination" (Count 3) under 42 U.S.C. § 1983. *Id*. at 22-25. Homewood has moved to dismiss, arguing that Sims fails to plead viable claims for relief. *See* docs. 5, 6. The court agrees in part.

## II.

A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Rule 8 does not require plaintiffs to plead "detailed factual allegations" fully outlining the merits of their case. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  A complaint states a facially plausible claim "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.*, and "[t]his standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the claim," *Jackson v. JPay, Inc.*, 851 F. App'x 171, 172 (11th Cir. 2021) (quoting *Twombly*, 550 U.S. at 556).

## III.

The court begins with Sims's Title VII claims for racial discrimination and retaliation, which are based on: (1) HPD's initial plan to reassign and demote Sims pursuant to the five-year rule; and (2) HPD's decision to eliminate the SIU entirely.

### A.

To establish a *prima facie* case of race-based disparate treatment under Title VII, a plaintiff must plead that: "(1) [he] belongs to a protected class; (2) [he] was

qualified to do the job; (3) [he] was subjected to adverse employment action; and (4) [his] employer treated similarly situated employees outside [his] class more favorably." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)). Homewood challenges only the last two prongs, arguing that Sims has failed to plead an adverse employment action as to the rescinded reassignment and has failed to satisfy the similarly-situated prong as to his SIU-elimination claim. Doc. 6 at 11-18.

1.

An employee suffers an adverse employment action for purposes of a Title VII disparate treatment claim only if the challenged action caused a materially negative change in the terms of his employment. *Crawford*, 529 F.3d at 970-73. Indeed, "[f]or disparate treatment, an adverse employment action must 'impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way.'" *Minnifield v. City of Birmingham Dep't of Police*, 791 F. App'x 86, 90 (11th Cir. 2019) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)). This means that a threatened or "anticipated" loss of compensation or title is not enough; the aggrieved employee must instead allege an "actual" loss. *Crawford*, 529 F.3d at 970-73. There is no actual loss here, where Sims concedes that HPD "abandoned" its purported plan to demote him pursuant to the five-year rule and does not allege that he faced any materially adverse change in his

7

employment in relation to this five-year-rule "scheme." Doc. 1 at 11. Sims did not face an "actual" loss until HPD eliminated the SIU, which Sims acknowledges was distinct from HPD's initial plan to demote him. *Id*. at 11-12. Sims has therefore failed to plead a Title VII racial discrimination claim related to the threatened strict application of the five-year rule.

2.

To maintain a disparate treatment claim, an employee must also allege that his employer treated similarly-situated employees outside his class more favorably. *Crawford*, 529 F.3d at 970. A plaintiff need not identify "nearly identical" comparators to meet this burden, but he must identify colleagues the employer treated differently despite being "similarly situated in all material respects." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019). Here, Sims points to two white SIU detectives who, unlike Sims, did not face a decrease in title or in pay after HPD eliminated the SIU. Doc. 1 at 12. But Sims acknowledges that these officers "had additional, joint assignments, which [is what] allowed them to keep their detective rank and salaries." *Id*. Sims does not allege that he also had additional joint assignments, and these white detectives are therefore not "similarly-situated" comparators. *Id*.; *Lewis*, 918 F.3d at 1218. Moreover, Sims admits that a white officer also faced a demotion and pay cut as a result of the SIU's elimination. Doc. 1 at 12. Sims has therefore failed to satisfy the fourth prong of the Title VII

*prima facie* case, and his disparate treatment claim related to the elimination of the SIU is due to be dismissed.

**B.**

Conversely, Sims's retaliation claim survives dismissal. "A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford*, 529 F.3d at 970 (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). Protected activities include filing a charge with the EEOC and "oppos[ing] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). And causation requires only a showing that "the protected activity and the adverse action are not completely unrelated," and a plaintiff can satisfy this prong "by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (internal citation omitted); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

Sims has met this burden. He engaged in a protected activity by both emailing his superiors about his claims of discrimination and then filing two EEOC charges, and he then suffered an adverse employment action when HPD demoted him and

9

lowered his salary pursuant to the SIU's elimination. Sims also alleges that HPD developed the plan to eliminate the SIU less than a month after he filed his amended EEOC charge and implemented the plan less than two months later. Doc. 1 at 11-13. This close temporal proximity, along with the alleged statements by fellow officers connecting the SIU's elimination to Sims's complaints of discrimination, *see id.* at 14-15, suffice to show a causal connection for purposes of Sims's *prima facie* case of retaliation.

## IV.

The court turns finally to Sims's § 1983 claim. Though the exact parameters of this claim are unclear from his complaint, Sims appears to plead that Homewood is liable under § 1983 for its alleged deliberate indifference to a culture of discrimination within HPD, including through an alleged failure to adequately train its employees "regarding workplace racism and race discrimination," that eventually led to Homewood's purported Title VII violations. *See* doc. 1 at 20-21, 24-25.

### A.

A municipality cannot be held liable pursuant to § 1983 solely under a vicarious liability theory. *Compare Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (permitting vicarious liability in Title VII cases), *with Iqbal*, 556 U.S. at 676 (noting that "vicarious liability is inapplicable to . . . § 1983 suits"). But, relevant here, a municipality may be held liable for a plaintiff's injury "when

execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). And this policy or custom need not be explicit; in order to adequately plead a "widespread practice or custom of racial discrimination or retaliation" for purposes of imposing § 1983 municipal liability, all a plaintiff must allege is such a "longstanding and widespread practice [that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Johnson*, 948 F.3d at 1329-30; *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991). In the failure to train context, this requires a plaintiff to show "that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

Here, Sims alleges that Homewood has had notice of overt examples of racism by HPD officers and complaints made by Black HPD officers about this discrimination, including prior EEOC charges, but has "taken no substantive steps to address and cure, or even attempt to cure, HPD workplace race discrimination." Doc. 1 at 14-20. Sims also claims that this failure to act was the proximate cause of the alleged disparate treatment and retaliation that he faced. *Id*. Accepting these allegations as true, Sims adequately pleads a "longstanding and widespread practice"

of Homewood failing to train and supervise its officers regarding racial discrimination in the workplace, which is sufficient to state a basis for municipal liability under § 1983. *Johnson*, 948 F.3d at 1329-30; *Brown*, 923 F.2d at 1481.

**B.**

Where "a plaintiff attempts to use Title VII and 42 U.S.C. § 1983 as parallel remedies for the same allegedly unlawful employment discrimination, the elements of the two causes of action are identical, and identical methods of proof [] are used for both causes of action." *Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (citing *Cross v. Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995); *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995)). For the reasons outlined above, *see supra* Section III, Sims has adequately pleaded the requisite elements of a *prima facie* claim for retaliation, but he has failed to state a claim for disparate treatment. Accordingly, Sims's § 1983 claim may proceed to discovery solely as it relates to Homewood's alleged retaliation.

**V.**

Consistent with this opinion, the court will issue a separate order denying the motion to dismiss, doc. 5, as to Sims's retaliation claims under Title VII and § 1983, and granting it in all other respects.

**DONE** the 25th day of April, 2022.

                                                 _____
                                                           **ABDUL K. KALLON**
                                                   UNITED STATES DISTRICT JUDGE