FILED
2022 Sep-06  PM 12:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# E X H I B I T   A

Plaintiff's Motion for Leave to Amend Complaint

PLAINTIFF'S FIRST AMENDED COMPLAINT

Victor Sims, II, v. City of Homewood, AL

Case No:  2:22-cv-0178-AKK

Filed September 6, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **VICTOR SIMS, II,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | |
| | ) | **JURY DEMAND** |
| **CITY OF HOMEWOOD, AL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff in the above-styled case, Victor Sims, II, by and through his undersigned attorney of record, and files and serves this First Amended Complaint against Defendant City of Homewood, Alabama,

This Amended Complaint clarifies and updates certain facts set forth in the original Complaint (Doc. 1), and, with additional facts, re-pleads Count III of the Original Complaint:  Race-based employment discrimination in violation 42 U.S.C. § 1983.

### Regarding this Amended Complaint

A. This Amended Complaint replaces but relates back to the original Complaint (Doc. 1). However, <u>Plaintiffs herein leave the Amended Complaint Introduction and Paragraphs 1-117 intact</u>, with amendments, clarifications and additional facts set out in Paras.118 -182 below (beginning on P. 26 of this Amended Complaint).

B. On March 3, 2022, Defendant Homewood filed a motion to dismiss Plaintiff's case in full. (Doc. 5).

C.  In its Order entered April 25, 2022, the Court denied Defendant's motion as to Plaintiff's retaliation claims under Title VII and 42 U.S.C. § 1983, and granted the motion as to all other respects (i.e., employment discrimination / disparate treatment based on race), and dismissed the non-retaliation claim/s, without prejudice (quoting the Order:

> [Defendant Homewood's Motion to Dismiss is] **DENIED** as to Sims's retaliation claims under Title VII and 42 U.S.C. § 1983, but is **GRANTED** in all other respects. Accordingly, Sims's disparate treatment claims in Counts I and III are **DISMISSED WITHOUT PREJUDICE**.

(Doc. 13; *see also*, the Court's Memorandum, Doc. 12)

D. Combining the facts and allegations set forth in the original Complaint with those set forth in this First Amended Complaint, Plaintiff reasserts his retaliation claims (i.e., those not dismissed by the Court's Order), and re-pleads his race-based workplace disparate treatment claim under 42 U.S.C. § 1983 only (Count III).

## ORIGINAL COMPLAINT INTRODUCTION

This is a Title VII disparate treatment and retaliation case arising out of Plaintiff's claim Defendant City of Homewood, Alabama, which employs Plaintiff as a police officer, violated Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C.

2

§2000e, *et seq*) when it subjected Plaintiff to race-based disparate treatment, then retaliated against him for participating in Title VII-protected acts. Additionally, Plaintiff alleges that but for his race (Black), Homewood would not have perpetrated discrimination and retaliation against him, and/or that his race was a motivating factor in the such treatment. Plaintiff also claims Homewood violated 42 U.S.C. § 1983 based on his race. Plaintiff has and will suffer damages proximately caused by Homewood. He seeks compensatory damages and other relief against Homewood.

## JURISDICTION AND VENUE

1.  Plaintiff Victor Sims, II, brings this action under Federal Question Jurisdiction, 28 U.S.C. §1331, arising out of the City of Homewood violating Title VII of the Civil Rights Act of 1964, as amended [Title VII] (42 U.S.C. §2000e *et seq*)*,* and 42 U.S.C. § 1983.

2.  Venue is proper as *(a)* Defendant Homewood is situated in Jefferson County, Alabama, and, *(b)* a substantial part of the claim occurred in Jefferson County, Alabama, that is, within in the Southern Division of the Northern District of Alabama, where Sims resides.

3.  Plaintiff filed his Equal Employment Opportunity Commission (EEOC) Charge of Discrimination with the Birmingham, Alabama, District Office on or about September 8, 2021; he filed a second, updated, Charge of Discrimination on or about

October 13, 2021.

4.  Upon Plaintiff's request, on November 18, 2021, U.S. Department of Justice Assistant Attorney General, Civil Rights Division, Kristen Clarke, issued a Notice of Right to Sue (NRTS) to Plaintiff. A copy of Plaintiff's NRTS is attached hereto.

5.  Plaintiff files this action within 90 days from his receipt of the EEOC's NRTS, as required under Title VII.

## PARTIES

6.  Plaintiff Victor Sims, II, ["Plaintiff" or "Officer Sims"] is an adult over the age of nineteen (19) years of age who resides in Homewood, Jefferson County, Alabama.

7. Defendant City of Homewood ["Defendant" or "Homewood"] is a municipality incorporated under the laws of the State of Alabama and which is situated in Jefferson County, Alabama.

8.  At all times relevant to the events, acts and omissions described herein, Homewood Police Department ["HPD"] Police Chief Tim Ross ["Chief Ross"], as well as any / all HPD Command Staff, HPD decision-makers, as well as all other HPD police officers (both named and unnamed) referred to herein, acted within the line, course and scope of their employment with Defendant Homewood and under color of law.

## STATEMENT OF FACTS

9.  Plaintiff is a 46-year-old police officer employed by Defendant as a police

4

officer in the HPD.

10.  Plaintiff is a husband and father of three, residing in Homewood, Alabama.

11.  For more than a dozen years, from 1995 into 2008, Plaintiff served his country in the United States Marine Corps, receiving an honorable discharge in 2008.

12.  Plaintiff, Officer Sims, joined the Homewood Police Department in 2008, where he has been employed as a police officer through the date of this filing.

13.  Plaintiff Sims is Black.

***Sims' August 2021 Internal Complaint and September 2021 EEOC Charge***

14.  As of August 2021, Officer Sims was a Detective who worked in HPD's Special Investigations Unit, primarily a narcotics and other drugs unit.

15.  On or about August 10, 2021, HPD Lieutenant Greg Brundage ["Lt. Brundage"], who is white, told Plaintiff (then a Detective), that he, Detective Sims, was going to be either be re-assigned out of Special Investigations Unit to a "School Resource Officer" ["SRO"] position, or to "patrol" – in either case a demotion.

16. Lt. Brundage told Detective Sims that the reassignment / demotion was based on a police requiring such re-assignments based on a rule requiring same when an officer has served in an HPD "special assignment" for five (5) years.

17.  Lt. Brundage's notice to then-Detective Sims was made with the blessing and approval of Chief Ross, who is Caucasian.

18. Over the years Homewood's HPD waives, ignores or otherwise does not enforce the aforementioned "Five Year Rule" for its Caucasian officers; while, in Plaintiff's case, following it to the letter a Black Detective.

19. Contemporaneous with Lt. Brundage's announcement to Plaintiff, the HPD was grooming a Caucasian officer to take Plaintiff's place.

20. On or about August 27, 2021, Plaintiff emailed Lt. Brundage, a Sgt. Marquard, and Chief Ross, stating, in sum, that the announced re-assignment / demotion / alteration of the terms and conditions of his work was based on race.

21. In his August 27, 2021, email, Plaintiff noted that his putative Caucasian replacement had been coming along on Special Investigations Unit operations in 2021, but that Special Investigations Unit detectives had been specifically instructed to use Motor Scouts (motorcycle officers) in conducting operations, and that Plaintiff's putative Caucasian replacement was not a Motor Scout nor assigned directly to Plaintiff's Unit or Division.

22. In his August 27, 2021, email, Plaintiff noted during several of his Division's (Unit's) recent operations, he was asked to train his putative Caucasian replacement, for example, to show him how to organize and conduct a controlled narcotics purchase.

23. In his August 27, 2021, email, Plaintiff noted that he had nothing personal against his putative Caucasian replacement, but that he objected to special

accommodation being made for one race at the expense of persons of another race.

24.  In his August 27, 2021, email, Plaintiff noted ". . . the Department allows white officers exemptions or exceptions to the 5 or 3 years move policies."

25. In his August 27, 2021, email, Plaintiff also provided a few examples of recent years' racism within the HPD which he had either eye-witnessed, or which was common knowledge within the HPD.

26. In his August 27, 2021, email, Plaintiff noted HPD's practice of "coddling white HPD officers who violate policies and/or who are overtly racist."

27. An example of recent years' HPD racism Plaintiff set out in his August 27, 2021, email:   At their August 10 meeting, Lt. Brundage telling Plaintiff that another Caucasian officer's position was "permanent," while HPD policy stated that other officer's position was "typically a maximum of 3 years[s] assignment" [while noting that other officer had been in that position for well over three (3) years].

28. An example of recent years' HPD racism Plaintiff set out in his August 27, 2021, email:  Lt. Brundage entering Plaintiff's office at the HPD, "venting" about a Sgt. Smith, who is Caucasian, telling Lt. Brundage he, Sgt. Smith, "couldn't work for a black man," (referencing [the sergeant's] move to the Detective Division) owing to a complaint a  Black officer had filed against him. In his email / complaint, Plaintiff said: "We all know Sgt. Smith was shifted, not fired or otherwise severely disciplined [owing

to the Black officer's complaint about the sergeant's racism]." Sergeant Smith was to work under a Black Lieutenant and – according to Lt. Brundage –  was upset about having to "work for a black man." In his email, Plaintiff Sims noted that not even this proclamation to Lt. Brundage got Sgt. Smith fired.

29. In his August 27, 2021, email, Plaintiff continued:  "This shows, within the past 1-2 years, more special accommodation for a white officer."

30. In his August 27, 2021, email, Plaintiff continued, asserting to Lt. Brundage directly that he should recall telling Plaintiff and other officers present about the Sgt. Smith incident, and how Plaintiff got angry and told Lt. Brundage he was obligated to say something [to the Chief].

31. In his August 27, 2021, email, Plaintiff noted to the recipients that "this isn't all," and recalled how about five (5) years earlier Chief Ross discussed racism with other Black HPD officers, but it became known throughout the department that the Chief became very defensive, especially with regards to complaints about Sgt. Smith and how, as history proved following that meeting, nothing changed.

32. Plaintiff reasonably hoped his email would elicit a response, but the only response he received was that his email would be forwarded to "Internal Affairs."

33. After a week, Plaintiff received no response, no follow-up from Chief Ross nor anyone with the HPD regarding his report of workplace race discrimination.

34. Plaintiff waited almost another week, but the silence from HPD Internal Affairs, Chief Ross, and others / anyone in HPD's Command Staff was deafening. With no response or action forthcoming, on September 8, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ["EEOC"], alleging discrimination based on race.

35. Plaintiff's EEOC Charge summarized his August 27 email, and attached a copy of that email to the Charge as an exhibit.

36. On or about September 30, 2021, Homewood submitted a "Position Statement" to the EEOC, responding to Plaintiff's EEOC Charge. However, neither the EEOC nor Homewood disclosed Homewood's Position Statement to Plaintiff – or even mentioned its existence – until October 21, 2021.

37. In the mean time, that is, during the period from Plaintiff's August 27 email, and his September 8 EEOC Charge, into October 2021, Homewood and the HPD's Internal Affairs department left Plaintiff hanging.

38. On October 13, 2021, having received no word, no follow-up from Homewood or Police Department, or the HPD's Internal Affairs division, and without any knowledge of Homewood's September 30 "Position Statement," Plaintiff filed a follow-up, amended, Charge with the EEOC.

39. The main thrust of Plaintiff's October 13, 2021, amended Charge alleged that

since submitting his initial report / complaint to Chief Ross, et al., on August 27, 2021, he had still heard nothing back (other than an acknowledgment of receipt) and that having such a report / complaint ignored from August 27 through October 13, 2021, "[S]ends a clear message:  'Don't complain about race discrimination with the HPD,' a message that would dissuade a reasonable person from reporting workplace discrimination with the HPD," which, by definition, constitutes retaliation.

40. Plaintiff's October 13, 2021, amended EEOC Charge put Homewood on notice about the holding in *Monaghan v. Wordplay, US, Inc.*, 2020 WL 1608155 (11th Cir. Apr. 2, 2020), in pertinent part:  "[T]he 11th Circuit Court of Appeals reversed summary judgment in a race and age discrimination case ('the [discrimination] complaint fell on deaf ears.'" In fact, Homewood never answered Plaintiff's August 27, 2021, email.

41. Plaintiff's October 13, 2021, amended EEOC Charge put Homewood on notice that with the exception of Command Staff, HPD won't interview Black officers or HPD employees regarding racism. . . let alone regarding the specifics of Plaintiff's August 27, 2021, internal complaint.

42. Plaintiff's October 13, 2021, amended EEOC Charge put Homewood on notices regarding how a Sgt. King, who is Caucasian, began referring to Plaintiff as 'The Enemy' owing to Plaintiff's complaining about, opposing, racism within the HPD. Plaintiff added his assessment and prediction that Sgt. King has not and will not be

disciplined for labeling a Black detective / officer a 'The Enemy' for reporting workplace racism because his expressed opinion lines-up with the HPD's culture of racism and/or tolerance of racism within it.

43.  Plaintiff's October 13, 2021, amended EEOC Charge also put Homewood on notice regarding Captain Ben Sutton's recently demonstrating something of an obsession with any conversations between Plaintiff and Officer Roderick Goodman. Officer Goodman is Black as of October 2021, had within the preceding 12-13 months complained about discrimination within the HPD.

44.  In his October 13, 2021, amended EEOC Charge, Plaintiff put Homewood on actual notice that Corporal Jonathan Wisenhunt, who is Caucasian, had made it known within the HPD that he would not tolerate Plaintiff's race discrimination complaint possibly resulting in his having to leave the Motor Scouts, along with the losing the pay bump that comes with Motor Scouts. Plaintiff also put Homewood on notice that within the context of discussing his August 27 race discrimination complaint, Corporal Wisenhunt told at least one fellow officer that if Plaintiff's workplace race discrimination  complaint got him, Wisenhunt, moved out of the Motor Scout division, he would "wind up getting fired because" because Wisenhunt would "whip [Plaintiff Sims'] ass." Plaintiff noted that Corporal Wisenhunt's proclamation was part of the toxic, racism-saturated culture within the HPD.

45. After Homewood was notified of the foregoing amended EEOC Charge allegations it took no remedial action to either substantively address the toxic racism within its police ranks or the harassment and retaliation Plaintiff alleged in his October 13 amended EEOC Charge.

46. On October 21, 2021, the EEOC disclosed Homewood's October 13, 2021, Position Statement to Plaintiff (that is, Homewood's response to Plaintiff's original, September 8 EEOC Charge).

47. Homewood's EEOC Position Statement, and, then, a follow-up Position Statement, primarily vilified and demonized Detective Sims, demonstrating no neutral or good faith attempt to address the substance of either his August 17 internal complaint, September 8 Charge, or October 13, 2021, amended EEOC Charge.

48. In both 2019 and 2020 Plaintiff Sims received an Award of Merit for his police work at the HPD. Homewood's Position Statement neglected to mention these awards, while simultaneously pouring scorn on Plaintiff in the wake of his reporting race discrimination – both against himself and as part of the HPD's internal culture – up the HPD chain of command and, then, to the EEOC.

### *A New Scheme, New Retaliation*

49. Owing to Detective Sims exposing the racism endemic in HPD's August 2021 scheme to demote him and replace him with a Caucasian officer – both internally and to

12

the EEOC – by November 2021, the HPD abandoned this scheme.

50. Another facet of the race-based disparate treatment Plaintiff exposed was that two (2) Motor Scouts, both white male officers, had put in more than five (5) years in their division but were not being subjected to the Five Year Rule Lt. Brundage, speaking for the HPD and Defendant Homewood, claimed Plaintiff had to follow.

51. However, also by November 2021, and within weeks of Sims filing his updated, amended, EEOC Charge, Homewood hatched a scheme to further retaliate against Detective Sims:  It eliminated his job.

52. In or around early-to-mid-November 2021, Chief Ross and other HPD decision-makers concocted a plan to eliminate Detective Sims' Special Investigations Unit and, with no more job, effectively demote Plaintiff down to patrol officer.

53. In eliminating his job and effectively demoting Plaintiff, Homewood materially altered the terms and conditions of his employment, including forcing Plaintiff to suffer a pay cut. This constituted a materially adverse employment action.

54. One Caucasian woman, Detective-, now Officer, K[1], also got caught in Chief Ross's net when he eliminated the Special Investigations Unit. She was collateral damage to Chief Ross' and other HPD decision-maker's retaliation against Plaintiff

———————————————

[1] Plaintiff understands all officers will eventually identified in full, but for the present wishes to maintain a degree of anonymity for certain fellow officers in order to mitigate against potential retaliatory "blow back" against them from either within the HPD or other Homewood City Leaders.

Sims. Conveniently, two (2) Caucasian male Detectives within the Special Investigations Unit had additional, joint assignments, which allowed them to keep their Detective rank and salaries. As for Officer K, she does not hold her demotion and pay cut against Plaintiff, but, rather, blames HPD decision-makers.

55. The pretext Chief Ross other HPD decision-makers used to eliminate the Special Investigations Unit was to improve "scheduling," yet the scheme caused as many scheduling gaps, conflicts and problems as it claimed it was meant to solve.

56. Chief Ross' and other HPD decision-makers' scheme went into effect at the beginning of January 2022.

57. Plaintiff's submitting an internal complaint on August 27, 2021; filing an EEOC Charge of Discrimination on September 8, 2021; and filing an Amended EEOC Charge on October 13, 2021 – all constituted opposing unlawful employment practices and/or filing Charges with the EEOC, which are protected activities under Title VII and 42 U.S.C. § 1981 (or, in the case of a Municipality Defendant, 42 U.S.C. § 1983).

58. Homewood retaliated against Plaintiff – (a) by ignoring his original internal complaint; (b) by ignoring and/or failing to investigate his internal complaint, then EEOC Charge in good faith; and, (c), by concocting an alternate avenue to demote Plaintiff when he exposed HPD's original scheme for the racially discriminatory exercise it was.

59. Homewood's aforementioned acts and omissions have proximately caused Plaintiff to suffer lost income, which he will continue to suffer into the future. Additionally, Homewood's aforementioned acts and omissions have proximately caused Plaintiff to suffer stress, anxiety, migraine headaches and other mental anguish above and beyond the stressors of being a cop.

### *Common Knowledge, Corroboration, Condemnation*

60. In the wake of Chief Ross and the HPD eliminating the Special Investigations Unit (and in doing so demoting Plaintiff), numerous HPD police officers have expressed their frustration, exasperation and contempt for what has been commonly seen as retaliation against Plaintiff for his complaining about racism within HPD.

61. While a significant percentage of HPD's Caucasian police officers are not racist and lament racist elements within their police department, too many are.

62. On or about December 12, 2021, in a conversation with HPD Sergeant P, Plaintiff asked Sgt. P what he understood was behind Chief Ross scuttling the Special Investigations Unit. Sgt. P said it looked to be "punishment" for Plaintiff raising race issues with the Chief. Sgt. P added that it "doesn't make sense" [as far as solving any HPD "scheduling" issues], or words to that effect. Sgt. P is Black.

63. On or about December 13, 2021, in a conversation with Officer G regarding Chief Ross and the "higher ups" eliminating the Special Investigations Unit, Officer G

told Plaintiff, "It's only because of your complaint. Anybody can see that," or words to that effect. Officer G is Black.

64. Also around December 13, 2021, regarding HPD dismantling the Special Investigations Unit and the scheduling issues that would not fix, or worsen, Officer B told Plaintiff:  "Everybody [in the police department] knows why these moves are happening – because of your complaint! Some of us are getting caught up in it [with upcoming schedule changes] as pawns," or words to that effect. Officer B is Caucasian.

65. On or about December 17, 2021, in a discussion with Homewood's Court Clerk and Chief Magistrate about the demise of the Special Investigations Unit and Plaintiff's demotion, the Chief Magistrate told Plaintiff, "They're [the decision-makers] doing it because of your complaint [about racism within the HPD]. Everybody sees that," or words to that effect. The Chief Magistrate also commended Plaintiff Sims for his "sticking up for what's right." Homewood's Chief Magistrate is Caucasian.

66. Also on December 17, 2021, Sgt. M told Plaintiff:  "They're [Chief Ross and his allies] only doing this because of your complaint," or words to that effect, referring to eliminating the Special Investigations Unit. Sgt. M continued:  "It's obviously to punish you for complaining [about workplace race discrimination]." Sgt. M is Caucasian.

67. On or around January 2, 2022, Plaintiff, now a patrol officer after his

Detective job was eliminated, met with Officer F to discuss the HPD patrol mobile program and the various scheduling moves that came in the wake of HPD getting rid of the Special Investigations Unit. During the course of their conversation Officer F stated to Plaintiff Sims:  "It's all just smoke and mirrors. They're are only doing it because of your complaint," or words to that effect. Officer F is Caucasian.

68. On or about the morning of January 5, 2022, after Roll Call, the HPD day shift sat around and chatted for a few moments, just shot the breeze. Present were Corporal Z, Corporal B, Officer P, Officer J, Officer W, Officer K, and Plaintiff Sims.

69. During these officers' conversation Officer W told a story of an arrest a former HPD Officer JT made, where the former Officer JT left all manner of evidence laying around the roll call room (computers, tablets, etc…) – a serious procedural, chain of custody, violation. Officer W continued, saying he, Officer W, left the room, but later returned to see the Officer JT still at work finishing up the evidence log and paperwork.

70. At this point in Officer W's story, Plaintiff chimed-in saying, "I don't know why he put so much energy into that. Through all of my years here I've learned that the Command Staff only cares about tickets." The other HPD police officers present smiled or laughed. No officer present disagreed with Plaintiff's observation.

71. Officer W responded:  "All you have to do is write a couple tickets, be a little racist and you're good here!" or words to that effect. Plaintiff Sims' then-present sense

impression was Officer W was stating fact; relating what he, Officer W, had witnessed considered common knowledge within the HPD. Plaintiff Sims' present sense impression was Officer W was condemning a custom or practice within the HPD, or lamenting signals – implicit conduct directives – sent down from HPD's decision makers, starting with Chief Ross, to HPD rank and file officers. Officer W is Caucasian.

72. No HPD police officer present during that January 5, 2022, discussion disagreed with Officer W. All HPD officers present, save for Plaintiff, were Caucasian.

### *Homewood's Recent Track Record on Race and Its Deliberate Indifference*

73. In or around the August 2015, and in the wake of a young Black woman dying while in HPD police custody, and the then-Chief *ordering* Black officers work a Black Lives Matter vigil, because it would look better for the media; Plaintiff filed an EEOC race discrimination in employment claim against Homewood.

74. Soon thereafter the then-Chief of Police retired, the EEOC issued a Notice of Right to Sue, but Plaintiff did not pursue the matter further, mainly owing to the former Chief's leaving.

75. In or around December 2015, Homewood's then-Mayor recommended  an internal promotion, that Chief Ross, then an HPD police officer, be promoted to Chief. The Homewood City Council approved the former Mayor's recommendation and Ross became HPD Chief on January 1, 2016.

76. Defendant City of Homewood's decision-makers were on actual notice of allegations of race-discrimination within the HPD as far back as the summer of 2015.

77. In July 2016, Chief Ross met with several black HPD officers who were concerned about racial tension in the HPD.

78.    One of the black officers who attended the meeting described the meeting and Chief Ross's conduct with disdain, calling it just "bullshitting and cooning."

79. Although Chief Ross promised a "diversity initiative" during the aforementioned July 2016 meeting, no diversity initiative has occurred, nor have the HPD's employment policies regarding workplace race discrimination been updated.

80. During the July 2016 meeting Sgt. S's name came up, the same Sgt. S mentioned in the foregoing Paragraph 28 (who was angry about working "for a Black man"). Sgt. S's troubling racist track record was discussed in front of Chief Ross (who had previously been Sgt. S's supervisor).

81. According to at least one black officer who attended the July 2016 meeting, the Sgt. S's once calling a Black HPD officer "tar baby" came up in front of Chief Ross.

82. In 2018 Sgt. S was honored by Homewood with the prestigious "Chief's Award."

83. In March 2020 Homewood was put on actual notice of Caucasian Internal Affairs Officer, a Sgt. F, having posted a racist, violent, "meme" on Facebook. Although

Sgt. F took down the meme, or hid it from public view, within three or four months after Homewood's being put on notice of it, he suffered no substantive disciplinary action from Chief Ross or Homewood.

84. In June 2020 Homewood was put on actual notice of Caucasian HPD Officer N posting racist, violent "rap" videos on social media. Officer N was in uniform in an HPD patrol vehicle in at least one of his videos. Officer N's videos praised "Valhalla" (Norse mythology's "heaven," a common White Supremacist trope); declared that "With a Rebel Yell, I prevail!" and sadistically promised, "Around your neck I flex this choke!"

85. Officer N's social media-posted videos came to Alabama media attention during the height of the Black Lives Matter protests over the murder of George Floyd, June 2020 (Mr. Floyd was murdered by Minneapolis Police Officer Derek Chauvin on May 25, 2020).

86. Chief Ross gave Officer N a three-day suspension and demoted him from Corporal to Officer – for social media celebrating racist tropes and sadism.

87. Since 2019 – and before Plaintiff filed his September 8, 2021, EEOC Charge – at least three (3) workplace race-discrimination EEOC Charges have been filed against Homewood regarding the HPD.

88. Homewood Police Department's written policy regarding race discrimination

(as well as other types of discrimination) is relegated to three (3) vague, circular, poorly-worded sentences, found at the bottom of a page in the middle of an approximately 150-page Policy and Procedure Manual (double-sided, thus totaling about 300 written pages). A prohibition against Retaliation is not mentioned.

89. For comparison's sake, the HPD policy regarding "Trousers Belt" and "Hat" totals six (6) sentences, twice that of HPD's race discrimination policy.

90. Homewood Police Department's written policy regarding race discrimination reflects Defendant Homewood's overall disdain or contempt for eliminating, or at least making an good faith attempt to mitigate, the custom or practice of workplace race discrimination within the HPD.

91. Over the past half-decade or more, and with actual notice of allegations of HPD workplace racism, Defendant Homewood has taken no substantive steps to address and cure, or even attempt to cure, HPD workplace race discrimination.

***Homewood's Failure to Train & Supervise. More Deliberate Indifference.***

92. Homewood provides only infrequent training courses, seminars and the like to the HPD regarding workplace racism and race discrimination.

93. With actual knowledge of the HPD's and Chief Ross's abysmal track record regarding workplace racism and, over the years, Chief Ross consistently ignoring or coddling Caucasian racists within the HPD, Defendant Homewood continues to simply

bury its head in the sand regarding training and supervising both Chief Ross, the HPD Command Staff and all of its officers and employees regarding workplace race discrimination and what *should* be a zero tolerance policy regarding it.

94. Homewood's aforementioned acts and omissions constitute deliberate and conscious choices made by its policy-makers and describe its deliberate indifference to upholding and complying with Title VII's and 42 U.S.C. § 1983's prohibitions against employment race discrimination, which, in turn, proximately caused the violations perpetrated on Plaintiff Sims and his damages suffered therefrom.

95. Homewood's aforementioned acts and omissions describe deliberate and conscious choices made by its policy-makers and evince a policy that constituted a moving force behind its deliberate indifference to upholding and complying with Title VII's and 42 U.S.C. § 1983's prohibitions against employment race discrimination, which, in turn, proximately caused the violations perpetrated on Plaintiff Sims and his damages suffered therefrom.

96. Homewood's aforementioned acts and omissions describe its policy-makers' deliberate and conscious choice to follow a course of action, a choice made from among various alternatives, a choice to ignore or disregard upholding and complying with Title VII's and 42 U.S.C. § 1983's prohibitions against employment race discrimination,

97. Homewood's deliberate and conscious policy, practice and custom choices

proximately caused the violations perpetrated on Plaintiff Sims as well as the damages he has suffered therefrom.

COUNT I

Title VII – Disparate Treatment Based on Race

98.  By this reference Plaintiff reiterates and incorporates the allegations set forth in the preceding paragraphs as if fully set out herein.

99.  Defendant Homewood, by and through its police department, notified Plaintiff it would demote him. When he exposed the racism inherent in Homewood's proposed demotion, it developed another scheme to demote Plaintiff and carried out its alternate scheme. This materially altered the terms and conditions of his employment.

100. But for Plaintiff's race, Black, Homewood would not have subjected him to the materially adverse employment action/s described herein.

101. The circumstances described herein show Plaintiff's race was at least *a* motivating factor for the disparate treatment and averse employment actions Homewood perpetrated against Plaintiff.

102. Homewood violated Title VII by discriminating against Plaintiff based on his race and/or Homewood demonstrated deliberate indifference in both its acts and omissions perpetrated against Plaintiff and in its failure or refusal to train and supervise its Chief of Police, Police Department Command Staff and other police officers.

103. Defendant Homewood, by and through its unlawful acts and omissions,

23

proximately caused Plaintiff to suffer lost income, stress, anxiety, migraine headaches and other mental anguish above and beyond the stressors of being a cop.

## COUNT II

### Title VII – Retaliation for Participating in a Protected Act

104.  By this reference Plaintiff reiterates and incorporates the allegations set forth in the preceding paragraphs as if fully set out herein.

105.   Plaintiff engaged in protected activities, including opposing unlawful employment practices and participating in a proceeding, to wit:  filing an EEOC Charge of Discrimination and amended Charge of Discrimination.

106. Plaintiff suffered adverse employment actions, including Defendant failing or refusing to investigate his complaint of workplace race discrimination in good faith, eliminating Plaintiff's Unit (and job), and demoting him after he exposed Homewood and its police department's original scheme to demote him and replace him with a Caucasian officer.

107.  A causal connection exists between Plaintiff's protected activities and the adverse actions perpetrated against him.

108. Numerous Homewood employees witnessed and/or have knowledge of Plaintiff's demotion and Homewood's retaliation against him (through the HPD and its decision-makers); they have acknowledged how obvious the retaliation is; they have

commented on how Homewood's retaliation against Plaintiff is common knowledge throughout the HPD.

109. The retaliation Homewood perpetrated against Plaintiff was such as would dissuade a reasonable employee from filing or supporting an EEOC Charge of Discrimination or otherwise asserting their rights under Title VII.

110. Defendant Homewood, by and through its unlawful acts and omissions, proximately caused Plaintiff to suffer lost income, stress, anxiety, migraine headaches and other mental anguish above and beyond the stressors of being a cop.

<u>COUNT III</u>

42 U.S.C. § 1983 – Race-Based Employment Discrimination

111.  By this reference Plaintiff reiterates and incorporates the allegations set forth in the preceding paragraphs as if fully set out herein.

112.   As a municipality, a government entity, all acts, omissions, race discrimination and the like perpetrated against Plaintiff by Homewood and described herein were done so under color of law.

113. It is patently obvious that racial discrimination in public employment is illegal. See, e.g., *See Smith v. Lomax,* 45 F.3d 402, 407 (11th Cir.1995).

114. The acts and omissions perpetrated by Homewood against Plaintiff describe unlawful race discrimination in public employment.

115.   Homewood demonstrated deliberate indifference in both its acts and omissions described herein and perpetrated against Plaintiff. Homewood continues to fail or refuse to train and supervise its Chief of Police, Police Department Command Staff and other police officers, as reflected in and demonstrated by their acts and omissions described herein. Homewood's deliberate indifference in matters of workplace race discrimination is nothing less than a policy choice.

116.   Homewood violated 42 U.S.C. § 1983 by depriving Plaintiff of his civil rights and discriminating against him under color of law.

117.   Defendant Homewood, by and through its unlawful acts and omissions, proximately caused Plaintiff to suffer lost income, stress, anxiety, migraine headaches and other mental anguish above and beyond the stressors of being a cop.

## AMENDMENT TO COMPLAINT

***Demotion***

118. Since Plaintiff's original Complaint was filed in February 2022, Homewood has contended he was not "demoted" from Special Investigations Unit Detective to Patrol Officer in January 2022.

119.   In late July 2020, regarding a former HPD Corporal, HPD Public  Affairs Officer John Carr was quoted in a media:  *[The officer] was demoted from the rank of corporal to officer and was moved out of the department's training division and back to*

*patrol."*

120.   Jefferson County (Alabama) Personnel Board Salary Administration Guide & Pay Plans [JeffCo Guide] are the pay schedules by and which most, if not all, HPD officers' salaries are calculated and paid.

121.   Under the JeffCo Guide, both Detectives and Corporals are provided an additional 5% pay "step."

122.   When HPD's John Carr spoke of the 2020 "demotion" for the corporal / officer in question, he was talking about both the job designation / rank, and a pay cut.

123.   When Plaintiff's SIU job was eliminated, he suffered a demotion in rank (from Detective to Officer) and was also subject to a 5% pay cut.

124.   In June 2022, Plaintiff was able to secure a HPD job with the Metro (Birmingham) Area Crime Center (based in Birmingham, not Homewood).

125.   Since securing this new position, Homewood has claimed Plaintiff's shift from Patrol Officer to the MACC now returns him to conducting "complex investigations," and, thus, has been effectively returned to his Detective's position and/or rank held prior to his being demoted to Officer in January 2022.

126.   In fact, when, in an email, Plaintiff specifically asked his (MACC position) supervising sergeant if his, Plaintiff's, designation was "Detective, Officer or Corporal?" his supervising sergeant would not answer his question, but responded to Plaintff's email

beginning with, "Officer Sims..."

127.  As also noted in Paragraph 136 below, another of Plaintiff's supervisors told him he was not allowed to put in for overtime in his MACC position.

128.  In sum, Homewood's ordering Plaintiff to lose his SIU job, and job title, to go from Detective to Patrol Officer was a demotion. And, even in his new "MACC" position, he remains "Officer" and is no longer eligible for overtime pay, a continuing rank designation demotion and adverse employment action regarding pay, both arising from Defendant's retaliation and/or race-based disparate treatment / failure to promote

### Ongoing Pay Issues

129.  Following the elimination of his job in the Special Investigation Unit and Plaintiff's demotion to Patrol Officer, Plaintiff was subject to a 5% salary cut for the period from around or about January 2, 2022, through about June 20, 2022, when Homewood shifted him to a position not subject to the pay cut.

130.  The 5% pay cut to which Plaintiff was subject was based on Jefferson County Personnel Board "*2021-2022 Salary Administration Guide & Pay Plan,*" which Defendant claims it follows.

131.  The almost half-year 5% salary reduction / pay cut, remains hanging over Plaintiff's head, though not yet deducted from his salary.

132.  Plaintiff has more than once asked Defendant decision makers whether or

not it will try to recoup or claw-back the pay in question, understanding his salary was at all times during this period subject to the reduction, including in an April 2022 email to Chief Ross, but Homewood's decision makers, including Chief Ross, have refused to answer this very simple question; thus the pay arrearage hangs over Plaintiff's head.

133.  In fact, within the past year, and when discussing the subject of Homewood overpaying or underpaying an employee, Defendant's Finance Department Director told Plaintiff Homewood had three (3) years to rectify pay discrepancies.

134.  In the spring of 2022, Homewood could have easily notified Plaintiff that it would or would not come after the 5% pay reduction / arrearage he was subject to, but it failed or refused to.

135. This has caused Plaintiff no shortage of additional stress and anxiety – not knowing when the blow may fall; not knowing whether or when Defendant would try to recoup or otherwise claw back the approximately half-year 5% arrears he remains subject to.[2]

136. Plaintiff, now in the MACC since late June 2022 is prohibited from putting in for overtime pay, which he was allowed to, both when he was *Detective* Sims with the

_____

[2] In the original Complaint Plaintiff speaks of a pay cut (see, e.g., Paras, 53, 110). While he was and remains subject to and under the dangling sword of the 5% pay cut, Homewood appears to waiting to decide when and/or how to recoup the money in arrears. That Chief Ross, and other HPD decision makers and/or Homewood's Finance Director, *refuse* to tell Plaintff whether or not Homewood will claw-back money paid, indicates Defendant's toying with Plaintiff, and will seek to recoup said funds.

Special Investigations Unit and even after he was demoted to Patrol Officer after his SIU position was eliminated.

137.  Plaintiff was not notified that he could not get overtime pay with the MACC united until after he had gotten the job in June 2022. This is a loss of income.

138.  As part of its ongoing retaliation and racism, Homewood sucker-punched Plaintiff:  He reasonably thought moving from the less prestigious (certainly compared to being an SIU Detective) Patrol Officer position (which also carried with it an ongoing 5% pay arrearage growing, paycheck to paycheck) to the MACC, where he could resume his 5% salary step, only to discover after he'd taken the new job that he could no longer get overtime pay and he remained "Officer" (notwithstanding a move to a "complex investigations" unit).

### *SIU:  Gutted, Then Reconstituted Without Plaintiff*

139. On December 7, 2021, after in or around November 2021, when Defendant's HPD decision makers decided to eliminate Plaintiff's job by more or less eliminating SIU (Special Investigations Unit), an HPD-wide email announced all members of SIU would be reassigned, with only Plaintiff and a female detective being demoted to "Patrol." (see Paras. 51 – 52, above).

140. After Plaintiff's lawsuit was filed on February 10, 2022, (Doc. 1), Homewood has contended SIU was not "eliminated," because, apparently, it still existed "on paper,"

even if all of its members were reassigned.

141.  When Plaintiff filed his original lawsuit, at best SIU existed on paper only and was not a functioning unit of the HPD.

142. On or about May 10, 2022, an HPD department-wide email was sent inviting HPD law enforcement officers to apply for "Future Vacancies" with the SIU.

143.  Plaintiff applied, wishing to return to his position at SIU.

144.  In or around early June 2022, in a discussion regarding the SIU openings and Plaintiff's application to return to SIU, Internal Affairs Lt. Doug Finch sang Plaintiff's praises and made no criticism of his record, but told Plaintiff HPD had a "better fit" for Plaintiff, or used words to that effect.

145.  The "better fit" was the MACC position, which put Plaintiff in downtown Birmingham, Alabama, away from the day to day workings of the HPD.

146. On or about July 13, 2022, a HPD-wide email went out with a memo attached notifying all HPD officers of those selected to SIU (as well as to a Warrant Officer vacancy).

147. An Officer Brugge and an Officer Hyatt were the officers selected for the openings, with Sgt. Marquard and Detective Ricketts returning from their CID jobs to SIU.

148. The reconstituted SIU included Officer Brugge, who was the original, less-

qualified Caucasian replacement for Plaintiff which Lt. Brundage notified Plaintiff about in August 2021, which caused Plaintiff to file his original August 27 internal complaint and lead to Plaintiff's September and October 2021 EEOC Charges.

### Homewood Comes Full Circle:  Replaces Plaintiff with Less Qualified Caucasian Officer/s

149. In his original Complaint (Doc. 1) Plaintiff alleges that in August 2021, HPD Lt. Greg Brundage notified Plaintiff he was being moved out of SIU – as it turned out to be replaced with a less qualified Caucasian officer, who, in fact, Plaintiff had been directed to train (See above, Paras. 15, 19, 21-23).

150. Officer Brugge was that putative, now actual, replacement.

151. Plaintiff had and has more training and experience as a detective and, in fact, more experience as a police officer, and more knowledge than Officer (now Detective) Brugge.

152. Officer, now Detective, Hyatt, who is also Caucasian, has even less experience than now-Detective Brugge.

153.  Homewood and its police department planned on and intended to replace Plaintiff at SIU with a less qualified, less experienced, Caucasian police officer in October 2021, but Plaintiff's August 2021 internal complaint, then September and October 2021 EEOC Charges, caused Homewood to alter, if not actually scrap, those plans.

154. Owing to Plaintiff's 2021 internal complaint, the EEOC Charges, Defendant Homewood wound up shifting its plans:  In or around November 2021, Homewood decided to demote Plaintiff in December, mothballed SIU in January 2022, repopulate SIU beginning in May 2022, and, in July 2022, complete its plan.

155.  Homewood originally planned on demoting / replacing Plaintiff effective October 2021.

156.  Owing to Plaintiff's  2021 internal complaint, EEOC Charges and eventual February 2022 lawsuit, Defendant Homewood modified and delayed its original plan, to become effective July 2022, about nine (9) months later than intended, but nonetheless arriving at its original destination:  Altering the terms and conditions of Plaintiff's job at SIU (in fact, kicking him out of SIU) and replacing him with the less qualified, Caucasian, Officer Brugge (and/or the even less experienced, trained and qualified Officer Hyatt). Whether under a demotion-replacement theory or failure to promote, the results remain discriminatory.

### *Additional:  Regarding Pretext*

157. In their meeting of or around August 10, 2021, Lt. Brundage told then-Detective Sims he was being moved from SIU to either a School Resource Officer or patrol position because of a "Five Year Rule." (See, above, Paras. 15-19).

158. This "Five Year Rule" reason was the only reason for the "reassignment"

given by Lt. Brundage to Plaintiff.

159. When in or around early June 2022, Plaintiff met with Lt. Finch – part HPD's new assignment decision- and/or recommendation-making team – and discussed his application to re-join the reconstituted SIU as a detective, Lt.. Finch never told Plaintiff he was in any way unqualified for that assignment, and, in fact, never mentioned any prohibition on Plaintiff's being disqualified for the now-reconstituted SIU based on an "Five Year Rule" (see above, Paras. 16-18).

160. Regarding Plaintiff's being demoted or otherwise reassigned away from SIU, in a sworn statement in July 2022, for the first time Chief Ross brought up that Homewood "sensed" Plaintiff should be "distanced" from SIU because it sometimes involved "joint FBI-Homewood joint investigation[s]" and a personal issue "concerned" the FBI.

161. Neither Chief Ross -- nor any HPD Sergeant, Lieutenant, or other HPD officer -- had ever mentioned such any such thing that "concerned the FBI." Not in 2022, 2021, or 2020, nor any time before that.

162.  While out shopping during the last week of August 2022, Plaintiff ran into the Birmingham Metro Area FBI Victim Assistance Advocate.

163.  Plaintiff and the FBI Victim Assistance Advocate knew each other from working together over the years.

164.   Plaintiff raised the issue of any local FBI "concerns" with him, and went into some detail regarding his personal life with the FBI Victim Assistance Advocate.

165.   The FBI Victim Assistance Advocate told Plaintiff she had not had any "concerns" about Plaintiff in his role in SIU as a sometimes joint-investigator with the local FBI.

166.   The local FBI Victim Assistance Advocate told Plaintiff she had never even heard of such "concerns."

167.   During their discussion, the FBI Victim Assistance Advocate suggested Plaintiff contact one of the Birmingham FBI Special Agents, about any such rumors.

168.   Plaintiff took the local FBI Victim Assistance Advocate up on her suggestion and, within a half-hour or so, phoned the local FBI Special Agent she mentioned.

169.   From time to time when he was with SIU, Plaintiff had worked with this Birmingham-stationed FBI Special Agent.

170.   During Plaintiff's and the local FBI Special Agent's phone call, Plaintiff explained that he was in litigation against The City of Homewood, then asked the FBI Special Agent whether he ever heard of anyone at the FBI stating they had "concerns" or similar things about working with him, Plaintiff. The FBI Special Agent said, that, no, he had never heard of any such "concerns."

171.   Plaintiff asked the FBI Special Agent, "*Would* you have heard about any

such "concerns" about me like that if they had existed?" or words to that effect. The FBI Special Agent replied that he could not imagine *not* hearing about any such local FBI "concerns," or that he'd be surprised to have not heard about any such concerns, or words to that effect.

172.  The FBI Special Agent with whom Plaintiff spoke volunteered to Plaintiff that, in fact, at one point during Plaintiff's time with SIU, the Special Agent thought so well of Plaintiff's law enforcement work that he, the Special Agent, wanted Plaintiff to become an FBI Task Force Officer (TFO).

173. Plaintiff once again asked the Special Agent whether he had heard of any "concerns" or negative sentiments expressed within the local FBI regarding Plaintiff, which the Special Agent made crystal clear that, no, he had never heard of any "concerns" from any member of the FBI about working with working with Plaintiff in law enforcement, going further to say that if such sentiments were expressed by anyone within the local FBI, he would be surprised not to have heard them.

174.  Homewood's and Chief Ross's holding out that the FBI was "concerned" about working with Plaintiff was either a complete fabrication or gross exaggeration, made in an attempt to backfill its demotion of Plaintiff and/or refusal to re-assign him to SIU when it was reconstituted in the spring and summer of 2022.

175.  Homewood's and Chief Ross's complete fabrication or gross exaggeration

that the FBI was "concerned" about working with Plaintiff evidences pretext, and signals Homewood's knowledge of guilt regarding its treatment of Plaintiff in the terms and conditions of his work.

### *Additional Evidence of Defendant's Intent*

176.  In or around the last week of August 2022, Plaintiff spoke with Homewood Police Department's only Black Lieutenant, who is a member of the HPD Command Staff.

177. Plaintiff and the Lieutenant spoke in general about Plaintiff's reputation among the HPD Command Staff, but the Lieutenant told Plaintiff he, the Lieutenant, could not really offer much, saying that while the Command Staff has weekly meetings, following those "official" weekly meetings, many or most of Caucasian Command Staff members conduct an unofficial meeting without him, the Black Lieutenant, and that he's certain that that's when the white Command Staff discuss Plaintiff and other issues, including race, that they do not want the Black Lieutenant to be part of.

178.   In fact, the "Whites Only" Command Staff meetings are common knowledge throughout the HPD, or at least common knowledge among many HPD officers and other personnel.

179.  In or around mid- or late-June 2022, Plaintiff had a conversation with one of HPD's Caucasian sergeants in which the sergeant congratulated Plaintiff on his new

posting out of "patrol" to the MACC.

180.   The sergeant went on to tell Plaintiff, "I can't tell you everything I know, but Vic, they *had* to move you [out of patrol], because with the moves they're [the HPD Command Staff] about to make in July, leaving you in patrol would've only bolstered your lawsuit [against Homewood]."

181.   Plaintiff reasonably believed and understood this HPD sergeant  was, first, foretelling that he knew the fix was in to promote Officer Brugge to SIU, and, second, his having learned HPD decision makers felt they had to put a "fig leaf" on this move; in other words, by assigning Plaintiff to the MACC it would mitigate the race discrimination of giving Officer Brugge (and the even less qualified and experienced Caucasian officer) the SIU jobs over Plaintiff.

_____

182.   Based on the foregoing allegations, Plaintiff hereby re-asserts his original claims for Retaliation (which the Court allowed to go forward in its Order of April 25, 2022 – Doc. 13), and re-pleads Count III of the original Complaint (see pp. 25-26 above) regarding workplace disparate treatment based on race – replacement by less qualified Caucasian employees and/or failure to promote – noting the allegations set forth in the original Complaint *in toto*, combined with allegations 118 - 181 made in this First Amended Complaint, and, in particular, those set forth in Paras. 149-159 above.

REQUEST FOR RELIEF

NOW, WHEREFORE, Plaintiff respectfully requests the following relief after trial of this case by struck jury:

A.  Entry of judgment in Plaintiff's favor and against Defendant for compensatory damages, including, but not limited to, lost income and benefits.

B. Entry of judgment in Plaintiff's favor for compensatory damages for the stress, frustration and mental anguish suffered, proximately caused by Defendant's retaliation.

C.  Injunctive relief in the form of an Order requiring Defendant to (i) re-visit and update its discrimination policies and, (ii) retrain City Council Members, Mayor, Chief of Police, Police Department Command Staff, and all employees of the Homewood Police Department regarding Title VII and related employment discrimination laws.

D.  Reasonable attorney's costs and fees.

E.  Any and all other relief at law or equity to which Plaintiff is entitled.

Respectfully filed on this, the 6th day of September, 2022.

Richard R. Newton
 Attorney at Law, P.C.
Counsel for Plaintiff, Victor Sims, II.
1200 Southbridge Parkway – Suite 650
Birmingham, AL  35209
Tel:  (205) 356-2498
richardrussellnewton@gmail.com
ASB-0776-w85r

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this, the 6th day of September, 2022, I served the foregoing Plaintiff's First Amended Complaint – as an Exhibit / Attachment to Plaintiff's Motion to Amend Complaint – on Defendant City of Homewood by sending same by email to its attorneys of record:

|  |  |
|---|---|
| Wayne Morse, Esq. | Email:  *wmorse@wskllc.com* |
| Michael G. Kendrick, Esq. | Email:  *kendrick@wskllc.com* |
| Waldrep Stewart & Kendrick, LLC | |
| 2323 Second Avenue North | |
| Birmingham, AL  35203 | |

*s/ Richard R. Newton*